AO 91 (Rev. 11/11) Criminal Complaint (Rev. by USAO on 3/12/20)   ☐ Original   ☐ Duplicate Original

# UNITED STATES DISTRICT COURT

LODGED
CLERK, U.S. DISTRICT COURT
12/18/2020
CENTRAL DISTRICT OF CALIFORNIA
BY: DM DEPUTY

for the

Central District of California

FILED
CLERK, U.S. DISTRICT COURT
12/18/2020
CENTRAL DISTRICT OF CALIFORNIA
BY VB DEPUTY

United States of America

v.

Cameron Anthony Hill,

Defendant(s)

Case No. 2:20-mj-06134

## CRIMINAL COMPLAINT BY TELEPHONE
## OR OTHER RELIABLE ELECTRONIC MEANS

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of December 17, 2020, in the county of Los Angeles in the Central District of California, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. § 841(a)(1) | Possession with Intent to Distribute Controlled Substances |

This criminal complaint is based on these facts:

*Please see attached affidavit.*

☒ Continued on the attached sheet.

/s/
_____
*Complainant's signature*

Demetrius Hartsfield, Special Agent
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date: _____12/18/2020_____

_____
*Judge's signature*

City and state: ____Los Angeles, California____

Hon. Pedro V. Castillo, U.S. Magistrate Judge
*Printed name and title*

### **AFFIDAVIT**

I, Demetrius Hartsfield, being duly sworn, declare and state as follows:

### I.  **PURPOSE OF AFFIDAVIT**

1.   This affidavit is made in support of a criminal complaint against Cameron Anthony HILL ("HILL") for a violation of 21 U.S.C. § 841(a)(1) (possession with the intent to distribute controlled substances).

1.   This affidavit is also made in support of a search warrant for Gold iPhone (the "SUBJECT DEVICE") in the custody of the United States Drug Enforcement Administration ("DEA"), in Los Angeles, California, as described more fully in Attachment A.  The requested search warrant seeks authorization to seize evidence, fruits, or instrumentalities of violations of 21 U.S.C. §§ 841(a)(1), 846 (distribution and possession with the intent to distribute controlled substances and attempt and conspiracy to do so), and 21 U.S.C. § 843(b) (unlawful use of a communications facility to facilitate the above-listed drug offenses) (the "Subject Offenses"), as described more fully in Attachment B.  Attachments A and B are incorporated herein by reference.

2.   The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses.  This affidavit is intended to show merely that there is sufficient probable cause for the requested complaint and warrant and does not purport to set forth all of my knowledge of

1

or investigation into this matter.  Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

## II. **BACKGROUND OF AFFIANT**

3.     I am a Special Agent with the United States Drug Enforcement Administration ("DEA"). I have been so sworn since December 2019. I am currently assigned to the DEA's Los Angeles Field Division, Southern California Drug Task Force, High Intensity Drug Trafficking Area ("HIDTA") Group 44, which is comprised of agents and officers from federal, state, and local agencies who are assigned to investigate large-scale drug trafficking. During the course of my employment with the DEA, I have received several hundred hours of comprehensive, formal instruction on topics such as drug identification, money laundering techniques, patterns of drug trafficking, complex conspiracies, the exploitation of drug traffickers' telecommunications devices, surveillance, and other investigative techniques. I have assisted in investigations into the unlawful importation, manufacture, possession with intent to distribute, and distribution of drugs and other controlled substances, and conspiracies involving drugs and controlled substance offenses. I have been involved in drug-related arrests that resulted in the seizure of drugs and other evidence. I have used a variety of investigative techniques and resources, including, but not limited to, surveillance, confidential sources, undercover operations, telephone toll analysis, and

wire intercept communications analysis in Title III wiretap
investigations.

4.    I am familiar with narcotics traffickers' methods of
operation including the distribution, storage, and
transportation of narcotics, and the collection and transferring
of money which represents the proceeds of narcotics trafficking
and money laundering.

5.    Additionally, I have been assisted in this
investigation by Special Agent Robert Thomas who has been with
DEA since 2009. Special Agent Thomas has worked on the Overdose
Death Investigations Team since its inception in 2018 and has
investigated numerous overdose cases since that time.

### III. SUMMARY OF PROBABLE CAUSE

6.    On or about January 6, 2020, 26-year old A.B.
("Decedent") died from fentanyl and ethanol toxicity.[1] Contents
of Decedent's cell phone included a WhatsApp conversation
between Decedent[2] and HILL,[3] which showed that Decedent and HILL
arranged to meet on multiple occasions, beginning on December 8,
2019, for suspected drug transactions.[4] A Federal Bureau of
Investigations ("FBI") Source of Information ("SOI"), who was

---

[1] All dates and times are approximate.

[2] Phone number (310) 904-3760.

[3] Phone number (818) 458-2654, believed to be used by HILL.
Pursuant to an Administrative Subpoena for this phone, I learned
that this number was used minimally from January 2019 and August
2020. Based on my training and experience, I know that drug
dealers typically have a second phone that they only use
sparingly and primarily for coordinating narcotics transactions

[4] Based on coroner's report and BHPD reports, the unknown
substance is believed to be Oxycodone.

hired by Decedent's family to coordinate a private investigation into Decedent's death, also conducted surveillance and undercover tactics that identified HILL as a possible suspect in Decedent's death.  HILL was seen by the SOI and the SOI's team on approximately three occasions, beginning on May 23, 2020, arriving and leaving Public Storage facility located at 5570 Airdrome Street, Los Angeles, CA, carrying a small black nylon bag or a small bag each time.[5] Additionally, HILL was seen by the SOI and SOI's team on June 27, 2020 leaving his residence of 2162 248th Street, Lomita, CA ("HILL Residence"), and subsequently arriving to a Starbucks in Calabasas, CA for what is believed to be a drug transaction.  Additional DEA investigation and surveillance corroborated the SOI's findings, and suggests that HILL also used another phone number as a personal phone but approximately April 1, 2020, HILL disconnected this phone line.[6]

7.    On December 17, 2020, law enforcement arrested HILL and executed federal search warrants at the HILL Residence and the Public Storage Unit.  During a search incident to arrest, law enforcement found the SUBJECT DEVICE on HILL's person. During the search of the HILL Residence and the Public Storage Unit, law enforcement found, among other items, approximately

---

[5] Based on surveillance and other investigation, law enforcement learned that HILL was using unit 347 at the Public Storage facility ("Public Storage Unit").

[6] Phone number (310)498-6422.  Based on my training and experience, it is a common tactic for drug traffickers to have multiple cell phones and also switch phone numbers periodically.

1,000 pills containing suspected narcotics and approximately $30,000.

## IV. STATEMENT OF PROBABLE CAUSE

8.   Based on my review of law enforcement reports, conversations with other law enforcement agents, conversations with Beverly Hills Police Department ("BHPD") investigators and SOIs, my review of Decedent's phones and Administrative Subpoena results, and my own knowledge of the investigation, I am aware of the following:

### A.   Overdose Death of Decedent

9.   On January 6, 2020, at 07:25 a.m., BHPD Officer Karley Loberg responded to a 911 call regarding a male not breathing at 156 South Spalding Drive in Beverly Hills, California.[7]  Upon Officer Lodberg's arrival, paramedics were already on scene and inside the residence.  Decedent was located in a bedroom laying on top of a bed, and was pronounced dead at the scene at approximately 07:31 a.m.

10.   Officer Loberg saw on a nightstand, located directly to the right of the bed, a small purple baggie containing eight round pills with an embossed "M" within a box on one side and a "30" on the other side.[8]  Officer Loberg saw a white powdery substance in a small pile on a laptop keyboard located on the right side of the bed.  In the nightstand drawer of Decedent's

---

[7] Decedent lived in the house alone.

[8] These markings are consistent with a 30 milligram Oxycodone, however, based on my training, experience, and conversations with Special Agent Thomas, I know that these same markings are commonly used in counterfeit pills which frequently contain fentanyl.

drawer, Officer Loberg found a prescription pill bottle for
Meloxicam, prescribed to Decedent and a clear jar containing
suspected marijuana.  Additionally, on the left side of the bed
Officer Loberg found a second prescription bottle containing
Doxycycline Hyclate, also prescribed to Decedent.  In a separate
room, Officer Loberg located a half empty bottle of vodka along
with a prescription bottle of NYS/ZN/SODBIC/BEN, prescribed to
Decedent.

11.  Officer Loberg spoke with Decedent's sister, C.H.,
with whom Decedent had attended a family party the prior evening
(January 5, 2020).  C.H. stated that Decedent had approximately
two "dirty martinis" at the party and appeared to be in good
spirits. C.H. told Officer Loberg she spoke to Decedent on the
phone on January 6, 2020 at approximately 12:18 a.m.  C.H. told
Officer Loberg that Decedent seemed to be really happy, had not
made any suicidal statements, nor did he mention being
depressed.  C.H. also stated she did not know of any drug abuse
by Decedent and that he had a history of sinus infections and
currently was sick with a cold.

12.  On the same day, Officer Loberg spoke with Decedent's
mother, J.D., who had last seen decedent on at the same party,
on January 5, 2020 at approximately 10:00 p.m.  J.D. said that
Decedent appeared to be extremely happy and she did not believe
he was suicidal or depressed.

13.  Officer Loberg also spoke with Decedent's friend,
W.W., who last spoke to Decedent on January 6, 2020, at
approximately 12:32 a.m.  W.W. stated she made plans with

Decedent for the following morning and that Decedent had plans throughout the day and did not believe he was suicidal. W.W. informed Officer Loberg she had talked to Decedent about drugs and he had a very negative view towards those who used them. Based on those statements, W.W. stated she was under the impression that Decedent never did any drugs.

14.   Additionally, Officer Loberg spoke with Decedent's ex-girlfriend, L.T.  L.T. stated she had not spoken to or seen Decedent since September 2019.  L.T. told Officer Loberg she remembered Decedent having mood swings where he would be incredibly happy then extremely angry without warning.  L.T. told Officer Loberg she discovered a text message conversation on Decedent's phone from who she assumed to be a drug dealer prior to them splitting up.  The text messages were describing pills such as Vicodin, Percocet, and Xanax.  L.T. stated she realized the mood swings were a side effect from the prescription drugs and began to notice him taking different pills.

15.   Lastly, Officer Loberg spoke with Decedent's neighbor, E.K.  E.K. stated that he was visiting his girlfriend, M.K., who was not at the location during the interview.  E.K. said that he was often at that location, and that he had met Decedent on numerous occasions but had not seen him in a few days.  E.K. informed Officer Loberg of an incident where Decedent was returning home and appeared to be under the influence.  E.K. stated he remembered this instance because

Decedent had fallen while walking up the stairs and E.K. caught him and helped him to his apartment.

### B.  Autopsy of Decedent

16.   The Los Angeles County Medical Examiner-Coroner's Office took custody of Decedent's body from the hospital.  The autopsy report identified the cause of death as effects of fentanyl and ethanol.[9]  The toxicology laboratory states that there was 5.1 ng/mL of fentanyl in his femoral blood, 13 ng/mL of fentanyl in his heart blood, and 92 ng/g of fentanyl in his liver.  Based on my training and experience, and my conversations with Special Agent Thomas, I know that 13 ng/mL of fentanyl is a large and potentially deadly quantity.  Special Agent Thomas has been involved with other overdose cases where someone has died with less than 10 ng/mL of fentanyl in their system.

### C.  Review of Decedent's Phone

17.   On or about October 14, 2020, BHPD Detective Kevin Burger provided me with the forensic image (Cellebrite) of Decedent's phone.  (Det. Burger had received consent to search the phone from Decedent's family.)  In reviewing this data, I was able to identify the phone number believed to be used by HILL. Following an Administrative Subpoena on AT&T (cellphone service provider), I identified the subscriber of this phone as "Jonny Doe" of 5400 Van Nuys Blvd., in Sherman Oaks, CA.  I

---

[9] Fentanyl is a prescription narcotic that is commonly mixed and pressed into other prescription pills.

determined that Jonny Doe is a fictitious name and that 5400 Van Nuys Blvd., in Sherman Oaks, CA, is the location of a Mercedes-Benz car dealership.[10]

18.   During my review of the forensic image, I found the following:

a.   Beginning on December 8, 2019, at approximately 3:39 p.m., the following WhatsApp message conversation occurred between Decedent and HILL's phone[11]:

> [DECEDENT]:
> What's up brotha you around today?
>
> [HILL]:
>  I've been praying for you brother I haven't heard from you in a while.
>
> [HILL]:
> Wednesday I will not be not sure if you can wait that long. Was in your area both Saturday and Sunday
>
> [DECEDENT]:
> All is well on my end man thank you
>
> [DECEDENT]:
> I'm fine whenever maybe this weekend will be better actually
>
> [HILL]:
> Wednesday night is best for me but can do Saturday afternoon probably
>
> [HILL]:
> Glad to hear you are doing well brother
>
> [DECEDENT]:

---

[10] Based on my training and experience I know it is common for drug dealers to use fictitious subscriber information.

[11] The extraction report displays participants as "18184582654@s.whatsapp.net +1 (818) 458-2654" and "13109043760@s.whatsapp.net Andrew (owner)."

I don't think I can do Wednesday can I let you know tomorrow?

[DECEDENT]:
It's possible it might work out

[HILL]: yea lmk brother
[HILL]:
If not maybe I'll do tomorrow night but I'll let you know

[HILL]:
Just lmk brother I can start or end with you Wednesday as well

[DECEDENT]:
Won't have the $ til tomorrow so this weekend will probably be best. Sorry about that if it messes up your plan

[HILL]:
No prob I'll see you around 145p or. 1150a whatever works best for you on Saturday

[DECEDENT]:
Ok cool yea that's good man thank you

[HILL]:
For sure brother I'll see you brother

[DECEDENT]:
Yo if you're still coming around today 1:45 will be the best time I won't be home til about 1:30

[HILL]:
See you then brother

[DECEDENT]:
Any chance you'll be around a little later maybe 2:30? I can make 1:45 work still if not

[HILL]:
It would have to be after 230 like 3-345

[DECEDENT]:
That's perfect if that's ok with you

[HILL]:
Yea all good brother

  i.   Based on my training, experience, and
knowledge of this investigation, I believe this conversation is
in regards to a drug transaction that took place on December 14,
2019.  Given the familiarity between Decedent and HILL, ("what's
up brotha,") and as no specific drug is mentioned, I believe
that a previous relationship exists between them, such that
neither felt a need to specify the type of drug being discussed.
I also believe, based on HILL's comment to Decedent, ("I can
start or end with you Wednesday,") that Decedent is not the only
drug customer of HILL.

  b.   The conversation continued on December 17, 2019,
at approximately 10:24 p.m.:

> [HILL]:
> I'll see what I can do but my connect got in a fight
> with the guy that the other less strong batch but
> I'll see if he can make up with him. Most people
> have liked these a lot better and find they need to
> use less though
>
> [DECEDENT]:
> Nah I feel you brotha these are fine I was just
> wondering if there is a possibility to get like the
> actual ones doctor style
>
> [HILL]:
> That's really hard to find. Very constrained because
> of the news I'd say 9 out of 10 youll find are being
> pressed
>
> [DECEDENT]:
> Yeah I figured that was the case
>
> [HILL]:
> I'll Look around but they'd but way more and could
> probably only get a few but I'll look for you
> brother
>
> [DECEDENT]:

I'm still down w these ones they're pretty good but
kinda make me not feel well you know? Gives me a
stomach ache

[DECEDENT]:
But yea if you can find the real ones out there I'm
ok taking the price hit. Same goes for bars, if you
can get real ones I would get a bunch of them like
20

      i.   Based on my training, experience, and
knowledge of this investigation, I believe the previously
unspecified drug to be oxycodone.  I believe the Decedent was
wanting to purchase pharmaceutical, "doctor style," oxycodone.  I
believe that HILL is selling counterfeit oxycodone, "my connect
got in a fight with the guy that the other less strong batch
[came from]," but that he could try to find them but that
pharmaceutical pills are harder to find, "9 out of 10 youll find
are being pressed," and would be more expensive, "way more and
[I] could probably only get a few."  I also believe that when
Decedent references "bars," he is referring to Xanax.

      c.   On January 3, 2020, at approximately 5:34 p.m.,
the conversation continued:

[HILL]:
Hey brother I wasn't able to find legit source but I
have a new batch in if you'd like to try I'll be in
your area tonight and tomorrow afternoon

[DECEDENT]:
All good bro no worries

[DECEDENT]:
I just got back from a trip. You around today?

[HILL]:
Yeah I got you brother can you wait until tonight?

[DECEDENT]:

Yeah for sure would have to be after 9 though is
that ok?

[HILL]:
Perfect I was thinking 10

[HILL]:
Maybe a bit before

[HILL]:
15 mins away

[HILL]:
You are home right?
.
.
.

[DECEDENT]:
Shit I'm 22 mins away

[DECEDENT]:
My bad

[DECEDENT]:
Is that ok?

[HILL]:
Parked on Charleville facing the Spaulding street
sign[12]

[DECEDENT]:
OK I'll be there in 10 so sorry my friend
.
.
.

[DECEDENT]:
See you in a min
.
.
.

{HILL]:
Coolio I'm here

---

[12] HILL is referring to Charleville Blvd., and South
Spalding Dr., located at the corner of Decedent's residence in
Beverly Hills, California.

i.   Based on my training, experience, and knowledge of this investigation, I believe that the HILL met with Decedent near Decedent's residence at or about 10:08 p.m., and provided Decedent non-pharmaceutical oxycodone pills, ("wasn't able to find a legit source but have a new batch").

19.   Based on these messages above and the interviews conducted by BHPD Officer/Detectives that HILL was the last person to see Decedent before he was found dead.   Based on my training, experience, and knowledge of this investigations, I know that drug distributors have used WhatsApp as a way to encrypt their messages and also tend to use code words or terms instead of the name of the specific drug (i.e., HILL stating "less strong batch" and "9 out of 10 youll find are being pressed").   I further believe, based on my training, experience, knowledge of this investigation, and the context of this conversation, that Decedent wanted pills specifically written by a Doctor ("Nah I feel you brotha these are fine I was just wondering if there is a possibility to get like the actual ones doctor style") and that HILL was going to look for a different batch ("That's really hard to find. Very constrained because of the news I'd say 9 out of 10 youll find are being pressed").



**D.   Private Investigation and Meeting with Hill**

20.   After Decedent's death, an SOI was hired by Decedent's family to conduct an investigation into Decedent's death and the source of the drugs which resulted in Decedent's death.[13]   The

---

[13] On August 28, 2020, I debriefed the FBI SOI regarding the private investigation into the death of Decedent.

14

SOI, with consent from Decedent's family, used Decedent's phone and the messaging app "WhatsApp" to set up the purchase of narcotics from HILL on or about February 9, 2020.

21.  On January 24, 2020, at approximately 7:36 p.m., HILL again reached out to Decedent, apparently unaware of Decedent's death.  With the permission of Decedent's family, the SOI used Decedent's phone to message back and forth with HILL.  The following conversation ensued:

> [HILL]:
> Heading to your part of town tonight and tomorrow afternoon if you need anything brother. I hope you are well
>
> [SOI]:
> What's up brotha
>
> [SOI]:
> Maybe this weekend
>
> [HILL]:
> Cool I got you brother
>
> [HILL]
> Does Friday night work for you ?
>
> [SOI]:
> Nah but tomorrow or Sunday?
> .
> .
> .
> [HILL]:
> Naw it will be Sunday I think or later if tomorrow. I'm busy during the day tomorrow And coming to town now
>
> [SOI]:
> What time tomorrow? Monday?
>
> [HILL]:
> Does 730p or 930p work for you

```
[HILL]:
Maybe 945p

[SOI]:
Hey bro looks like 9:30 9:45 can work

[HILL]:
Perfect I'll see you then brother

[HILL]:
10-15 mins away I'll text when close brother.
```

22.   During the above conversation on February 9, 2010, SOI
and SOI's team observed HILL pull in behind the garage of
Decedent's residence driving a white Tesla Model 3 (California
license plate 8LYL872; registered to Karen Middleton Hill, 1837
Carmona Ave, Los Angeles, CA) (the "White Tesla").   HILL was
observed searching around Decedent's residence in an attempt to
locate the front door and the item left for him ("A few not as
long as last time but I left you something behind trash can";
"In cup behind trash by front door").   The SOI and SOI's team
were able to positively identify HILL, as well as take photos of
HILL and his vehicle.

23.   Based on my training, experience, and knowledge of
this investigation, I believe that the above messages show that
the SOI setup a meeting with HILL using Decedent's phone.   By
using Decedent's previous interactions with HILL via WhatsApp,
the SOI was able to act as Decedent.   Based on the messages
above, I believe HILL had no knowledge of Decedent's death.

**E. On December 17, 2020, Law Enforcement Arrest HILL, Execute Federal Search Warrants at HILL House and Public Storage Unit, and Found Approximately 1,000 Pills Suspected to Contain Narcotics and Approximately $30,000**

24.  On December 16, 2020, the Honorable Rozella A. Oliver, United States Magistrate Judge, issued two search warrants related to this investigation.  First, Judge Oliver issued a warrant to search the HILL Residence, in case number 2:20-mj-06091.  Second, Judge Oliver issued a warrant to search the Public Storage Unit, in case number 2:20-mj-6094.

### 1.  Search of HILL Residence

25.  On December 17, 2020, at approximately 8:00 a.m., law enforcement executed the search warrant at the HILL Residence. After law enforcement announced, "Police search warrant," HILL was arrested outside of the HILL Residence.  During a search incident to arrest, law enforcement found the SUBJECT DEVICE. HILL provided law enforcement with codes to unlock the SUBJECT DEVICE and the smart door lock on the front door of the HILL Residence.  HILL stated that he lived in the HILL Residence and was heading out of the house to work at "Thor Fiber."



26.  Law enforcement subsequently entered the HILL Residence and announced their presence.  Law enforcement encountered Christina Didonato ("Didonato") and Claudia Sarnowska ("Sarnowska") inside of the HILL Residence and removed them from the house while law enforcement executed the search warrant.[14]

------

[14] Based on information from the SOI and my knowledge of this investigation, Sarnowska is HILL's girlfriend.

27.  During the search, law enforcement found a safe inside of the bedroom of HILL and Sarnowska.  HILL claimed ownership of the safe and unsuccessfully attempted to open the safe by entering several incorrect codes.  After the safe locked out HILL, law enforcement forcibly opened the safe and discovered, among other things, approximately 500 pills, empty pill capsules, empty small clear baggies, suspected psilocybin mushrooms, prescription pill bottles, blue bottles containing male enhancement liquid, and a silver spoon with a dry white powdery substance.[15]  Law enforcement also found blue pills with "M30" embossed on one side in two of Sarnowska's purses.  Law enforcement also found the same types of pills in the bathroom trashcan of HILL and Sarnowska.

### 2.   Interviews of HILL and Sarnowska

28.  I read HILL his Miranda Rights verbatim from a DEA 13A card, and HILL stated he wanted an attorney.  I ceased questioning HILL afterward.

29.  DEA Special Agent Hartsfield read Sarnowska her Miranda rights verbatim from a DEA 13A card, and Sarnowska stated "I understand."  Sarnowska then gave law enforcement information in relation to her drug use and knowledge of HILL's drug distribution.  Sarnowska stated that HILL and she moved to the HILL Residence approximately in May of 2020.  Sarnowska also told SA Hartsfield that she and HILL got their pills recently from a guy named "Mickey" in Anaheim, California, and that they

---

[15] Law enforcement field tested several pills, and the pills tested positive for methamphetamine, fentanyl, cocaine, and other substances.

purchased approximately 300 pills for approximately $10 per pill.  Sarnowska also stated that she threw away the pills found in the bathroom trashcan of HILL and Sarnowska's bedroom as law enforcement entered the residence because she was scared.

### 3.   Search of the Public Storage Unit

30.  Concurrently with the execution of the search warrant at the HILL Residence, law enforcement executed the search warrant at the Public Storage Unit.  Inside of the Public Storage Unit, law enforcement found a safe.  Law enforcement verbally relayed the existence of the safe to officers at the HILL Residence, and law enforcement at the HILL Residence asked HILL for the code to the safe inside of the Public Storage Unit. HILL provided the correct code to that safe.  Inside of the safe, law enforcement found approximately $30,000 U.S. currency along with scales, suspected liquid codeine, approximately 500 pills, empty pill capsules, suspected psilocybin mushrooms, multiple bags containing unknown substances, and pill bottles containing unknown pills.

### V.   **TRAINING AND EXPERIENCE ON DRUG OFFENSES**

31.  Based on my training and experience and familiarity with investigations into drug trafficking conducted by other law enforcement agents, I know the following:

a.   Drug trafficking is a business that involves numerous co-conspirators, from lower-level dealers to higher-level suppliers, as well as associates to process, package, and deliver the drugs and launder the drug proceeds.  Drug traffickers often travel by car, bus, train, or airplane, both

domestically and to foreign countries, in connection with their illegal activities in order to meet with co-conspirators, conduct drug transactions, and transport drugs or drug proceeds.

b.   Drug traffickers often maintain books, receipts, notes, ledgers, bank records, and other records relating to the manufacture, transportation, ordering, sale and distribution of illegal drugs.  The aforementioned records are often maintained where drug traffickers have ready access to them, such as on their cell phones and other digital devices, and in their residences.

c.   Communications between people buying and selling drugs take place by telephone calls and messages, such as e-mail, text messages, and social media messaging applications, sent to and from cell phones and other digital devices.  This includes sending photos or videos of the drugs between the seller and the buyer, the negotiation of price, and discussion of whether or not participants will bring weapons to a deal.  In addition, it is common for people engaged in drug trafficking to have photos and videos on their cell phones of drugs they or others working with them possess, as they frequently send these photos to each other and others to boast about the drugs or facilitate drug sales.

d.   Drug traffickers often keep the names, addresses, and telephone numbers of their drug trafficking associates on their digital devices and in their residence.  Drug traffickers often keep records of meetings with associates, customers, and

suppliers on their digital devices and in their residence, including in the form of calendar entries and location data.

e. Drug traffickers often use vehicles to transport their narcotics and may keep stashes of narcotics in their vehicles in the event of an unexpected opportunity to sell narcotics arises.

f. Drug traffickers often maintain on hand large amounts of United States currency in order to maintain and finance their ongoing drug trafficking businesses, which operate on a cash basis.  Such currency is often stored in their residences and vehicles.

g. Drug traffickers often keep drugs in places where they have ready access and control, such as at their residence or in safes.  They also often keep other items related to their drug trafficking activities at their residence, such as digital scales, packaging materials, and proceeds of drug trafficking. These items are often small enough to be easily hidden and thus may be kept at a drug trafficker's residence even if the drug trafficker lives with others who may be unaware of his criminal activity.

h. It is common for drug traffickers to own multiple phones of varying sophistication and cost as a method to diversify communications between various customers and suppliers.  These phones range from sophisticated smart phones using digital communications applications such as Blackberry Messenger, WhatsApp, and the like, to cheap, simple, and often

prepaid flip phones, known colloquially as "drop phones," for actual voice communications.

## VI. __TRAINING AND EXPERIENCE ON DIGITAL DEVICES__[16]

32.  Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that the following electronic evidence, inter alia, is often retrievable from digital devices:

33.  Forensic methods may uncover electronic files or remnants of such files months or even years after the files have been downloaded, deleted, or viewed via the Internet.  Normally, when a person deletes a file on a computer, the data contained in the file does not disappear; rather, the data remain on the hard drive until overwritten by new data, which may only occur after a long period of time.  Similarly, files viewed on the Internet are often automatically downloaded into a temporary directory or cache that are only overwritten as they are replaced with more recently downloaded or viewed content and may also be recoverable months or years later.

34.  Digital devices often contain electronic evidence related to a crime, the device's user, or the existence of evidence in other locations, such as, how the device has been

---

[16]  As used herein, the term "digital device" includes any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal digital assistants; wireless communication devices, such as paging devices, mobile telephones, and smart phones; digital cameras; gaming consoles; peripheral input/output devices, such as keyboards, printers, scanners, monitors, and drives; related communications devices, such as modems, routers, cables, and connections; storage media; and security devices.

used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications, and materials on the device. That evidence is often stored in logs and other artifacts that are not kept in places where the user stores files, and in places where the user may be unaware of them. For example, recoverable data can include evidence of deleted or edited files; recently used tasks and processes; online nicknames and passwords in the form of configuration data stored by browser, e-mail, and chat programs; attachment of other devices; times the device was in use; and file creation dates and sequence.

35. The absence of data on a digital device may be evidence of how the device was used, what it was used for, and who used it. For example, showing the absence of certain software on a device may be necessary to rebut a claim that the device was being controlled remotely by such software.

36. Digital device users can also attempt to conceal data by using encryption, steganography, or by using misleading filenames and extensions. Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed. Law enforcement continuously develops and acquires new methods of decryption, even for devices or data that cannot currently be decrypted.

37. Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that it is not always possible to search devices for data

during a search of the premises for a number of reasons, including the following:

38.   Digital data are particularly vulnerable to inadvertent or intentional modification or destruction.  Thus, often a controlled environment with specially trained personnel may be necessary to maintain the integrity of and to conduct a complete and accurate analysis of data on digital devices, which may take substantial time, particularly as to the categories of electronic evidence referenced above.  Also, there are now so many types of digital devices and programs that it is difficult to bring to a search site all of the specialized manuals, equipment, and personnel that may be required.

39.   Digital devices capable of storing multiple gigabytes are now commonplace.  As an example of the amount of data this equates to, one gigabyte can store close to 19,000 average file size (300kb) Word documents, or 614 photos with an average size of 1.5MB.

40.   The search warrant requests authorization to use the biometric unlock features of a device, based on the following, which I know from my training, experience, and review of publicly available materials:

a.   Users may enable a biometric unlock function on some digital devices.  To use this function, a user generally displays a physical feature, such as a fingerprint, face, or eye, and the device will automatically unlock if that physical feature matches one the user has stored on the device.  To unlock a device enabled with a fingerprint unlock function, a

user places one or more of the user's fingers on a device's fingerprint scanner for approximately one second.  To unlock a device enabled with a facial, retina, or iris recognition function, the user holds the device in front of the user's face with the user's eyes open for approximately one second.

b.   In some circumstances, a biometric unlock function will not unlock a device even if enabled, such as when a device has been restarted or inactive, has not been unlocked for a certain period of time (often 48 hours or less), or after a certain number of unsuccessful unlock attempts.  Thus, the opportunity to use a biometric unlock function even on an enabled device may exist for only a short time.  I do not know the passcodes of the devices likely to be found in the search.

c.   Thus, the warrant I am applying for would permit law enforcement personnel to, with respect to any device that appears to have a biometric sensor and falls within the scope of the warrant: (1) depress HILL's thumb- and/or fingers on the device(s); and (2) hold the device(s) in front of HILL's face with his or her eyes open to activate the facial-, iris-, and/or retina-recognition feature.

41.   Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means.

## VII.  CONCLUSION

42.   For all the reasons described above, there is probable cause to believe that Cameron Anthony HILL violated 21 U.S.C. §

841(a)(1): Possession with Intent to Distribute a Controlled Substance.

43.   Further, there is probable cause to believe that the items listed in Attachment B, which constitute evidence, fruits, and instrumentalities of violations of the Subject Offenses will be found on the SUBJECT DEVICE, as described in Attachment A.


Attested to by the applicant in
accordance with the requirements
of Fed. R. Crim. P. 4.1 by
telephone on this  18  day of
 December , 2020.

_____
HON. PEDRO V. CASTILLO
UNITED STATES MAGISTRATE JUDGE